Commonwealth *v.* Frisbie, Appellant.

Argued May 12, 1941. Before SCHAFFER, C. J., MAXEY, DREW, LINN, STERN, PATTERSON and PARKER, JJ.

*Joseph F. Ingham,* with him *J. H. Thayer,* for appellant.

*William G. Schrier,* with him *Albert F. Heess,* District Attorney and *Irving M. Stern,* for appellee.

OPINION BY MR. JUSTICE PARKER, May 26, 1941:

Harold B. Frisbie pleaded guilty to an indictment charging murder and the court below, after hearing the evidence, adjudged him guilty of murder in the first

degree and imposed the death penalty. It is now argued that the evidence did not support a finding of first degree murder and that in any event it did not justify the imposition of the death sentence. The judgment must be affirmed.

In compliance with the duty prescribed by our statute (Act of February 15, 1870, P. L. 15; 19 PS §1187), we have reviewed both the law and the evidence and find that all the ingredients necessary to constitute murder in the first degree have been proved to exist. The evidence against defendant consisted of his written and signed confession and his own testimony in open court showing that Edward Lee was killed by bullets from an automatic revolver fired by Frisbie while engaged in the commission of a robbery. The circumstances leading up to the time of the killing and the movements of the defendant thereafter were detailed by him, and his admissions were corroborated by many witnesses.

In October, 1940, the defendant, who was then thirty-three years of age, was living in Bucks County, having recently married a divorced woman with two children. Being in need of money, he decided to go to the neighborhood of Towanda, Pennsylvania, where he had formerly lived, and rob the store of one Lyman Snyder at Eldredsville. He procured an automatic revolver, the property of a relative of his wife, and went by bus to Towanda. He remained at a hotel in that place overnight, departing without paying his bill, and then spent Sunday at the home of a friend with whom he had become acquainted in the Eastern Penitentiary. He left the friend's home on Monday morning, October 14, 1940, and began to look for an automobile which he could steal for use in perpetrating the planned crime at Eldredsville and in escaping from the scene. While in Sullivan County, after obtaining several rides, he saw the deceased approaching in a Buick automobile. He solicited and was given a ride. When he had gone a short distance he pulled the automatic revolver from

his pocket and commanded the deceased, Edward Lee, to stop the car and get out. Lee stopped the car but grabbed the defendant by his left wrist and started twisting it. Thereupon defendant pulled the trigger, discharged the gun, and wounded his victim. Lee opened the door and fell out, pulling the defendant with him. Defendant again fired the gun at Lee several times. He picked up Lee, who was not yet dead, and placed him in the rear of the car with the cushion over his body and proceeded to a bridge over a stream. Defendant, after examining the body of Lee and finding that he was dead, took a considerable sum of money and the deceased's shoes from his person and threw the body into the stream underneath the bridge. He then drove the Lee car to the state of New Jersey and purchased a cheap car with New Jersey license tags which he placed upon the Lee car. He was apprehended a few days later while in possession of the car. The contention of defendant is that he had not intended to kill but that when deceased grabbed his wrist he could not get away and so started to fire. Even if this were true, it would not lessen the crime and make it murder of less than first degree.

By the Act of March 31, 1860, P. L. 382, §74, as amended (18 PS §2221), it was provided that "all murder . . . which shall be committed in the perpetration of, or attempting to perpetrate any arson, rape, robbery, burglary, or kidnapping, shall be deemed murder in the first degree." In *Com. v. Lessner*, 274 Pa. 108, 118 A. 24, it was held that where the gun which fired the fatal shot was in defendant's possession for the criminal purpose of robbery it was immaterial that the discharge was unintentionally caused while struggling with the victim or with a third party who came to the latter's assistance. Here the case is even clearer for the defendant admitted that he pulled the trigger. The malice of the initial offense attaches to whatever

else the criminal may do in connection therewith and by the statute the killing is deemed first degree murder: *Com. v. Guida*, 341 Pa. 305, 19 A. 2d 98.

Counsel for the appellant, while admitting that defendant knew right from wrong, insist that he did not have "complete consciousness" of moral right and that therefore the penalty should have been life imprisonment. In support of that position defendant testified as to the circumstances of his early life. He said that he had lost his father when very young, that his mother then married a man who mistreated him, and that he spent a portion of his childhood at a poor farm with his mother. He only reached the third grade in school. We may assume that his early life was a hard one although he admits that he had a place to live and plenty to eat. At an early date he embarked on a course of crime and was committed for burning a school house, for larceny of automobiles, and for stealing an airplane. Although now only thirty-three years of age, he has been incarcerated in a correctional institution for boys, in Huntingdon Reformatory, in the Eastern Penitentiary, and in a penitentiary in New Jersey.

He called Dr. Hydock, a general practitioner, who testified in part as follows: "I think Harold Frisbie is an unfortunate product of an abject home environment and poor home environment during those very early impressionable making years. Years of character building. Particularly through harrying influence, mostly through introvert mental influence. Harold Frisbie, to my mind has been repressed and buffeted and scared from pillar to post, not only physically but mentally. Professionally I say his mentality is that of an average child of ten or twelve years. Physically he is mature, due to the very early home influence; early childhood training. I think that at heart he is honest, but despite his poor home environment in those early growing years, early impressionable growing years, I think that his good qualities have not been developed

and cultivated. He has not been taught to express himself along those sound lines consistently, that I believe are a basic part of his make up."

The court below received all the evidence offered in respect to defendant's mental condition. The painstaking opinion which the court subsequently filed shows that the evidence was carefully examined and that full consideration was given to such condition as an element in mitigation and extenuation. That court pointed out in its opinion that defendant had displayed intelligence and accurate memory on the stand and that the murder was not committed under the impulse of some frenzy or strong passion or as the result of a mind weakened by social entanglement or by alcoholism. It concluded that it could not accept the opinion of Dr. Hydock that the mentality of defendant was that of an average child of ten or twelve years of age for he was mature and was able to procure employment at the carpenter trade and as an airplane mechanic and he possessed the ability to get a pilot's license and operate a plane. The court commented also upon his appearance and his expressions, all indicating that he was not what would be commonly referred to as dull. A careful reading of the record confirms the conclusions reached by that court. The defendant's own admissions convict him of an atrocious crime, and defendant's subsequent conduct was coldblooded and callous.

The record discloses that the defendant knew exactly what he was doing before, during, and after the crime; that he understood the nature and consequences of his act; that he wilfully and deliberately planned the robbery several days before he committed this act as a part of his plan. On this aspect of the appeal we are concerned only with the duty of the judge who presided in the court below and we are required to examine the record for the purpose of ascertaining whether the discretion vested in him was judicially exercised: *Com. v. Garramone,* 307 Pa. 507, 513, 161 A. 733; *Com. v.*

*Sterling,* 314 Pa. 76, 80, 170 A. 258. We are all of one mind in finding that there is nothing in the record that would justify us in concluding that the court below abused its discretion in imposing the death sentence.

Judgment and sentence affirmed and the record is remitted for the purpose of execution.